**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 19-711-1** |
| | : | |
| **JOSEPH FABIILLI** | : | |
| | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Joseph Fabiilli went to great lengths to promote a series of pump-and-dump schemes to enrich himself and his co-conspirators at the expense of thousands of hapless victims whom he fraudulently induced to purchase securities that Fabiilli knew were worthless. Through Program Funding Advisors ("PFA") and Secondary Funding Advisors ("SFA"), companies that Fabiilli and his partner Christopher Knight co-owned, Fabiilli retained boiler-room operators to sell worthless stocks to the investing public, and once victims had been secured, they coordinated the release onto the market of enough shares to satisfy that manufactured demand. In carrying out this critical aspect of the scheme, Fabiilli was responsible for recruiting boiler-room operators, overseeing their operations, determining which victim sales were attributable to their respective efforts, and compensating them in accordance with their dubious achievements.

Fabiilli's criminality is compounded by the fact that this is not his first federal securities fraud conviction. In 2003, Fabiilli pled guilty to conspiracy and securities fraud. Despite the seriousness of his conduct, Fabiilli received a lenient sentence. Yet, no more than seven months after his supervised release expired, Fabiilli involved himself with the same kind of illegal conduct with many of the same people who had participated in his prior criminal scheme. *See*

PSR ¶¶ 24, 55. Pursuant to this reorganized conspiracy, Fabiilli and his co-conspirators pawned off the worthless stock of five different issuers onto thousands of individual victims.

Fabiilli's innocent victims were not the only people harmed by his current misconduct. Because Fabiilli and his partner Knight knew that they could not be associated with any securities transactions, Fabiilli assigned his wife the role of President of PFA and SFA, exposing her to the risks of prosecution, conviction, and punishment for the frauds that he undertook.[1] Likewise, Fabiilli recruited their old conspirator, Eric Lesak, to operate a boiler room to sell fraudulently inflated stocks in Resort Savers, Axiom, Virtual Medical, and Union Bridge. Until that time, Lesak had successfully avoided relapsing to drug use and securities fraud. Fabiilli's entreaties undermined Lesak's resolve and gained both his allegiance and his assistance.

Fabiilli's crimes were serious and repetitive, and he carried them out despite his actual awareness of the wrongfulness of his conduct and the suffering that it would impose. Ordinarily, these factors would call for a sentence at the top of the calculated sentencing guideline range, particularly where, as here, the defendant stipulated to additional Guidelines enhancements that the government no longer seeks to enforce.[2] However, due to the defendant's serious health concerns and other factors addressed in the supplemental sealed attachment to this sentencing memorandum, the government believes that such a sentence would represent more incarceration

---

[1] Fabiilli formed PFA, and made his wife its president, in January 2012, less than three months after his prior term of supervised release expired, suggesting that the defendant's criminal intentions likely hatched even before his formal involvement in the current conspiracy in April 2012.

[2] Based on information learned in connection with other defendants' sentencings, and in order assure that this defendant receives the benefit of positions taken by the government in connection with his co-conspirators' sentencings, the government will not enforce against Fabiilli his plea agreement stipulations to fraud loss amount and sophisticated means.

than is necessary under the circumstances. Still, for the reasons addressed by the government, a significant sentence, including a substantial period of incarceration, is warranted.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[3]

The government explains below its view of the proper consideration in this case of the advisory guideline range, the Section 3553(a) factors, and other relevant considerations.

## I. BACKGROUND

### A. Procedural Background.

On December 12, 2019, a federal grand jury returned a two-count indictment charging Fabiilli with conspiracy to commit securities fraud and securities fraud, in violation of 18 U.S.C. §§ 1348 and 1349.

On October 16, 2020, the U.S. Attorney's Office for the Eastern District of Pennsylvania filed a superseding information charging defendant Fabiilli with: (i) conspiracy to commit securities fraud, in violation of 18 U.S.C. § 1349 (Count One); (ii) securities fraud, in violation of 18 U.S.C. § 1348 (Counts Two, Four and Seven); (iii) conspiracy, in violation of 18 U.S.C. § 371 (Count Three); (iv) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b–5 (Counts Five and Six); and (v) wire fraud, in violation of 18 U.S.C. § 1343 (Count Eight).

---

[3] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

On November 18, 2020, the defendant appeared before the Honorable Petrese B. Tucker, waived prosecution by indictment, and pled guilty to all eight counts of the information. Fabiilli's sentencing is currently scheduled for September 23, 2026, at 2:00 p.m.

**B. Factual Background.**

In 2012, Thomas Tedrow introduced Jerome Wenger to Jeffrey Martin, a self-proclaimed reverse merger guru. Martin was interested in selling MSEI, a publicly traded shell company nominally owned by his son. MSEI had last operated as a functioning business in approximately 2008. On September 20, 2012, First Power & Light ("FPL"), a company controlled by Wenger, signed a stock purchase agreement, by which it purchased MSEI for $50,000.

Wenger also received 50 million shares of MSEI stock as part of the deal. Wenger maintained effective control over a majority, approximately 35 million, of these shares. Although Wenger's shares were initially "restricted," which meant that they could not be traded on the public markets, Wenger paid an Ohio attorney to write an opinion letter in order to lift the restriction on the sale of the MSEI shares. Once the restriction was removed, Wenger, the Tedrows, and other participants in the scheme engaged in manipulative trades of MSEI stock, designed to increase the trading volume of MSEI stock and to lead the investing public to believe that MSEI was a hot stock with increasing value.

Wenger, and later Jeffrey Martin, hired Joseph Fabiilli and Christopher Knight, operating through their company, PFA, to promote and sell MSEI stock to the public in exchange for financially significant kickbacks. In turn, PFA hired several co-defendants to operate "boiler rooms" to pump MSEI stock.

In addition, from at least October 2015 through at least December 2019, defendant Fabiilli participated in a conspiracy to defraud the investing public by fraudulently inflating the

stock price of Resort Savers, Axiom, Virtual Medical, and Union Bridge through materially false and fraudulent statements about those companies and their respective securities, and through the manipulative trading of those securities.

Fabiilli was aware of and/or participated in the following activities of the co-conspirators as part of these conspiracies with respect to the stock of MSEI, Resort Savers, Axiom, Virtual Medical, and Union Bridge (collectively, the "Target Companies"):

- Martin had or acquired control of the common stock of each of the Target Companies.
- The conspirators drafted and disseminated false, fraudulent and misleading press releases, email distributions, and other communications and filings relating to the Target Companies for the purpose of convincing the investing public that the Target Companies had more business and were more valuable than they, in fact, were, thereby inflating the price of the stock of the Target Companies.
- The conspirators used manipulative stock trading techniques fraudulently to inflate the price of the stock of the Target Companies, including the use of stock promoters and non-arms-length trading with related parties to create the illusion of volume.
- The conspirators engaged in pre-arranged sales and purchases of stock between or among themselves or other individuals under their control, referred to as "coordinated trading," in order to create the false appearance of an active and liquid market in the Target Companies' stocks and to artificially drive up the share price and trading volumes of those stocks.
- The conspirators operated what is known as "boiler rooms" in which co-conspirators cold-called potential investors, used high-pressure sales tactics, and provided those potential investors with false and fraudulent information, for the purpose of getting them to buy shares of the Target Companies.
- The conspirators paid undisclosed commissions to stock promoters and boiler room operators for selling shares of the Target Companies.
- The conspirators sold stock in the Target Companies, often in a coordinated manner, during and after the promotions in order to maximize profits.
- The conspirators took steps to hide transfers of funds among themselves to avoid regulatory detection.

- The conspirators received shares, both restricted and free-trading, of stock in the Target Companies to compensate them for participating in the scheme.

Fabiilli was primarily responsible for recruiting and supervising the boiler room operators who did the hands-on work of identifying victims and convincing them to purchase the fraudulently-inflated shares that Fabiilli and his partner Knight were promoting. Once the victims had been induced to make purchases, Knight would contact Martin (or Wenger) to make sure that the required number of shares were available and to direct the release of those shares to the unsuspecting buyers. After Fabiilli's co-conspirators closed the deceitful sales, Fabiilli was responsible for determining which boiler-room operators were responsible, and allocating to them their share of the resulting unlawful proceeds.

The defendant and his partner, Knight, were paid undisclosed commissions ($685,608 from Martin and $843,007 from Wenger) for promoting the sale of MSEI shares. Knight and Fabiilli received about $6,524,215 from their fraudulent manipulation of the other stocks.

## II. SENTENCING CALCULATION

### A. Statutory Maximum Sentence.

The statutory maximum and minimum sentences are as follows: Count One (conspiracy to commit securities fraud), 25 years' imprisonment, a 5-year period of supervised release, a $250,000 fine, and a $100 special assessment; Counts Two, Four, and Seven (securities fraud), 25 years' imprisonment, a 5-year period of supervised release, a $250,000 fine, and a $100 special assessment for each count; Count Three (conspiracy), 5 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment; Counts Five and Six (securities fraud), 20 years' imprisonment, a 3-year period of supervised release, a $5,000,000 fine, and a $100 special assessment for each count; Count Eight (wire fraud), 20

years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment.

Thus, the total maximum sentence is 165 years' imprisonment, a 5-year period of supervised release, $11,500,000 fine, and a $800 special assessment. Forfeiture of all proceeds from the offense also may be ordered.

**B. <u>Sentencing Guidelines Calculation</u>.**

The government agrees with the Probation Office's calculation (*see* PSR ¶¶ 38-52, 90) of the defendant's proposed advisory Guideline range:

| | |
|---|---|
| Base level offense, USSG § 2B1.1: | 7 |
| Loss between $3.5 and $9.5 million, USSG § 2B1.1(b)(1)(I) | +18 |
| Number of victims/mass marketing, USSG §2B1.1(b)(2): | +2 |
| Violation of prior court order, USSG §2B1.1(b)(9): | +2 |
| Aggravating role in the offense, USSG §3B1.1(b): | +3 |
| <u>Acceptance of responsibility, U.S.S.G. § 2D1.1(b)(1):</u> | <u>-3</u> |
| **Total Offense Level** | **29** |

Based on a criminal history score of 3 points, Fabiilli falls into Criminal History Category II. PSR ¶¶ 53-58. Thus, Fabiilli has an advisory Guideline range of 97 to 121 months' imprisonment. PSR ¶ 90.

Fabiilli contests the Probation Office's application of an aggravating role enhancement. However, as his own grand jury testimony and proffer statement establish, the PSR's characterization of Fabiilli's role is entirely accurate. The defendant was not only a critical participant in the sophisticated pump-and-dump schemes that he and his coconspirators carried out, but he exercised substantial supervisory and oversight authority over other members of the

conspiracy. Indeed, Fabiilli has admitted that he was the person who retained and paid the promoters who pawned the conspirators' worthless stock inventory off onto the unsuspecting victims of their scheme. Given that this case involves more than five sentenced defendants, the defense objection should be overruled.

Fabiilli also ask s the Court to apply the Sentencing Guideline amendments effective November 2026. Those amendments will alter the fraud loss table so that the +18-level enhancement no longer corresponds to its present range of $3.5 to $9.5 million, but instead will apply to a range of $5.0 to $15 million. Noting that the PSR establishes his loss amount at between $3.5 million and $9.5 million, and that this loss amount will overlap two different enhancement ranges in the to-be-amended Guidelines, Fabiilli asks the Court to reject the PSR's +18-level adjustment and, instead, apply the amended Guidelines' +16-level enhancement that will be applicable to a range of $2 million to $5 million.

Fabiilli's request should be rejected for several reasons. *First*, and most simply, this amendment will not be effective at the time of Fabiilli's sentencing. The fact that the levels will change at some time in the near future does not somehow make them applicable now. To the contrary, Fabiilli is being sentenced based on the current book. *Second*, and relatedly, the changes to the loss table that Fabiilli seeks to apply prematurely were implemented to account for inflation. But Fabiilli's crimes occurred between 2012 and 2019. Thus, no inflationary adjustment is appropriate here. Indeed, all of Fabiilli's co-conspirators were sentenced under the current loss table. To accept Fabiilli's argument would introduce an unwarranted sentencing disparity between him and his codefendants.

Third, and perhaps most significantly, Fabiilli's request represents an extraordinary act of audacity. In his plea agreement, Fabiilli stipulated that his guideline range *should be calculated*

with a fraud loss amount of more than $19 million. As discussed in footnote 2 above, the government has agreed not to hold the defendant to this this stipulation, allowing for a 2-level Guideline reduction to a range of $3.5 to $9.5 million. The fact remains, however, that Fabiilli agreed that $19 million was the appropriate loss amount to use in his case. For him to claim, as he does, that his actual loss "could fall anywhere" within the range of $3.5 to $9.5 million is not merely an exercise in revisionist history but constitutes an effort to improperly leverage the government's generosity. While the government remains willing to release the defendant from the binding effect of his stipulation, it believes that the +18-level enhancement assessed by the PSR remains fully applicable.

## III. ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

**A. Consideration of the 3553(a) Factors Regarding Imprisonment**

The nature of Fabiilli's conduct in this case, including (i) the harm that he caused, (ii) his active recruitment and involvement of other participants, and (iii) the fact that Fabiilli engaged in this conduct after having previously been convicted for engaging in practically the identical conduct, all suggest the need for a significant period of incarceration.

Although the defendant's victims are too numerous, and their injuries too diffuse, to warrant an order of restitution, *see* PSR ¶¶ 34, 106-07, the remaining sentencing factors, taken with the defendant's cooperation, suggest that a substantial period of incarceration is appropriate in this case.

**1. The nature and circumstances of the offense and the history and characteristics of the defendant**

**a. The nature and circumstances of the offense**

The defendant participated in the orchestration of multiple financial schemes that directly targeted the American securities markets. The ultimate purpose of the securities laws is to maintain public confidence in the integrity of the United States securities markets and to assure that unsophisticated investors have a fair opportunity to profit from their investments. By manipulating the markets, the defendant's conduct threatened the community's faith in the markets. Worse yet, the defendant's scheme directly targeted the type of unsophisticated investors who are least able to protect themselves. In so doing, the defendant and his coconspirators not only harmed the investors whom they defrauded, but also undermined the public's confidence in the integrity and fairness of the markets more generally.

That his victims were many, and that their losses were widely dispersed, does not alter the magnitude of the loss, but it does mean that the harm that Fabiilli caused was widely spread in two separate ways. Not only were the direct financial consequences spread over many thousands of victims, but the structural market-based harm that he caused was effectively spread over virtually all market participants. As a consequence, the harm for which Fabiilli is accountable is less direct than the harm that would be caused by other thefts of the same magnitude.

Nonetheless, Fabiilli's conduct is made more egregious both by the nature of its criminality and by its repetitiveness. As recruited by Fabiilli, boiler-room operators contacted gullible targets and tricked them into to "investing" their hard-earned money in worthless securities. Between the number of securities involved in the defendant's conspiracy, and the

number of persons contacted by the co-conspirators, this deception was repeated so many times that restitution is now impractical.

Worse yet, these harmful consequences were not merely foreseeable to Fabiilli, but were actually intended by him to follow from his conduct. Fabiilli doled out compensation to his boiler-room operators based on their success in tricking and defrauding gullible investors. The more people were harmed, and the more clearly that harm was attributable to Fabiilli and Knight, the more Fabiilli paid to his boiler-room operators.

Fabiilli, moreover, did not confine his dissemination of harm to the direct victims of his scheme. In order to deflect suspicion from himself, Fabiilli made his wife the chief executive of the corporate vehicles that he and Knight used to carry out their unlawful securities fraud activities. In so doing, he placed in grave legal danger the very person who has held him up as "the greatest father and greatest husband." *See* PSR ¶ 70. Similarly, when Fabiilli needed a new boiler-room operator to replace Barbera and Esposito, he prevailed on his former co-conspirator, Eric Lesak, to return to the world of securities fraud and drug abuse that Lesak had, to that point, successfully resisted.

Worst of all, Fabiilli had previously been caught, prosecuted, and sentenced for a pump-and-dump securities fraud scheme with Knight, Wenger, Lesak, and others. Not only did Fabiilli proceed to engage in exactly the same kind of conduct, causing exactly the same type of harm, but he did so with many of the same persons with whom he had previously conspired. Adding insult to this injury, and highlighting Fabiilli's apparent lack of remorse, he has made only token payments, amounting to less than 1%, of the fine imposed on him for his 2006 conviction.

Fabiilli's failure to pay his court-imposed debt represents a clear statement about Fabiilli's lack of respect for the justice system. Not only did Fabiilli make, at best, only token

payments throughout the time that he was amassing millions of dollars from the securities fraud schemes for which he now stands convicted, but he carried out that criminal conduct in the face of a judicial judgment barring precisely the conduct that he carried out.

In light of these facts, a substantial term of imprisonment for Fabiilli is warranted.

**b. The history and characteristics of the defendant**

Joseph Fabiilli's history and characteristics also suggest that a significant period of incarceration is needed. As discussed above, Fabiilli's history is most notable for the fact that this is not his first securities fraud conviction. In 2006 he was convicted for engaging in same type of securities fraud, with many of the same people, causing the same type of harm, to the same kinds of victims. Just a few months after his supervised release from that case expired, Fabiilli formed PFA, one of the corporate entities he used to commit the frauds for which he now stands convicted. Apparently aware that this company would conduct the sort of activities with which Fabiilli should not be involved, and that any association with him would call unwanted attention to PFA's doings, Fabiilli made his wife the president of PFA. Shortly thereafter, Fabiilli began to use PFA to carryout the securities fraud schemes in this case. As this history demonstrates, Fabiilli's previous conviction and incarceration were insufficient to convince him to conform his behavior to the dictates of the law. Indeed, Fabiilli used his personal influence to sway one of his former confederates away from the law-abiding life that he was then leading in order to aid Fabiilli in fleecing unsuspecting "investors." This history suggests that, regardless of his physical ailments, Fabiilli will always pose some level of risk to society. Indeed, Fabiilli's ill-health is of such longstanding that he served his prior sentence at one of the BOP's hospital facilities.

**2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

The seriousness of the offense, as described above, is initially reflected in the adjusted offense level, after credit for acceptance of responsibility. The government believes that a substantial sentence of imprisonment is needed to reflect the seriousness of the offense and promote respect for the law.

**3. The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant**

Deterrence is an important consideration in this case. As discussed above, Fabiilli's prior criminal and personal history suggest the need for specific deterrence. Only a significant period of incarceration combined with a lengthy term of supervised release and a fine will meet the needs of both specific and general deterrence, and will hopefully protect the public from further crimes of the defendant.

**4. The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner**

The defendant's needs for "educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." 18 U.S.C. § 3553(a)(2)(D) can be met initially by the Bureau of Prisons, and then by significant supervision by the Probation Office.

**5. The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Here, given the factors discussed above, a significant sentence of incarceration, a lengthy period of supervised release, and a substantial fine would not produce unwarranted sentencing disparities.

**B. <u>Supervised Release and Fine</u>.**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of five years is warranted. As explained above, the defendant presents a troubling prior record of nearly identical conduct and a persistent refusal to adhere to judicial commands. Close supervision following release from imprisonment is warranted to aid his reentry to society and to protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue education and vocational efforts that promote rehabilitation, § 3553(a)(2)(D), and pays restitution to victims, § 3553(a)(7). Further, the Sentencing Commission recognizes that "the more serious the defendant's criminal history, the greater the need for supervised release." § 5D1.1 app. note 2.

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3, as well as the additional condition that the defendant not have any ownership or management involvement, either formal or informal, with any issuer of stock traded on any public exchange.

Finally, because the defendant's crime was motivated by greed, a fine of $500,000 would be appropriate.

## IV. CONCLUSION

For these reasons, and subject to any factors that may be presented at the defendant's sentencing hearing and in the Sealed Supplement, the government believes that a significant sentence that fully accounts for the scope and severity of the defendant's criminal conduct is appropriate in this case.

Respectfully submitted,

DAVID METCALF
United States Attorney

*<u>/s Paul G. Shapiro</u>*
PAUL G. SHAPIRO
Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the Government's sentencing memorandum and motion for downward departure has been served by electronic filing and I also served a copy by email upon:

James R. Froccaro, Jr., Esquire
20 Vanderventer Avenue
Port Washington, New York, 11050
jrfesq61@aol.com

Michael J. Engle, Esquire
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018
mengle@stradley.com

*/s Paul G. Shapiro*
PAUL G. SHAPIRO
Assistant United States Attorney

DATED: September 18, 2026